Thank you, Your Honor. My name is Gregory Albert for the plaintiffs, or I suppose the appellants, the Davis family. We did receive the focus order last week and that kind of circumscribed what I think I should probably talk about today. It seems to me the first thing I should address would be the questions about where to find certain questions of material fact, in the record. And the first one would be, where in the record does it show that R.D. was allowed to go outside on cold and rainy days? And there's a lot of, I think, circumstantial testimony about that, but rather than bury the lead, let me just go straight to the direct testimony from R.D. herself. She stated, sometimes I would go outside when it was cold or rainy just because I was miserable. Nobody told me that I had to stay in. And that's at ER 258. Does that have a time frame attached to it? Yes. If Your Honor looks at the declaration, you're going to see that the context is 2017. But there's plenty more testimony about 2017. And in fact, she gave even more elaborate testimony in state court, in response to a summary judgment motion there on the Washington law against discrimination claims. She said, sometimes I would go outside when it was cold or rainy just because I was miserable. I went outside on a lot of days when it was cold and rainy and nobody told me I could not. I remember one day it was so rainy and windy that I saw someone's umbrella going inside out. The mother also, Mrs. Davis, also testified that she confirmed that, and this is in 2017 as well, because this is right before she pulled her out of school. In fact, this was the predicate for pulling her out of school. She arrived to find, or excuse me, confirmed that she had been allowed to go outside on some days she knew to be too cold. Excuse me, that's 2016. 2017, realized R.D. had been outside when she should not have, and also testified that R.D. had told her that she goes outside no matter what. She goes outside whenever she can, no matter what. All of that is in the record. And then I can give the court citations. I just don't want to waste time if the court already has those citations or already knows where to find those. With regard to, well, if we could just take a step back, you know, the default is that these children go outside to recess. The default, obviously, is not that they stay inside. And so, you know, the next question I think should be asked is what were the mechanics of her staying inside? Who told her to stay inside? When was the decision made? Because obviously the mother negotiated to ensure that there was an adult to supervise when she goes outside and when she stays inside. And the Lake Washington School District, we probed and probed to try to find out who that adult was, and we were unable to find any answers. Lake Washington School District now claims that it was Janet Zins, or at least mentions Janet Zins 12 times when they're arguing against deliberate indifference. They say that they put Janet Zins in charge of implementing the 504 plan, but Janet Zins testified she knew nothing about a 504 plan. She didn't know anything about, quote, whatever plan she was on. What is the evidence then of deliberate indifference with respect to the post-2015 period? So what the court saw as evidence of deliberate or evidence that there's no deliberate indifference were the meetings that were set up, the effort to communicate with the parents. The fact that they put Lake Washington School District right now is claiming that the fact that they put Janet Zins in charge of implementing the 504, that there couldn't have been deliberate indifference. But with all due respect to the district court, that just puts form over substance. There's plenty of testimony in the record, probably even more so than anything else, that the principal was insincere about those things. The principal would say those things and would never follow up about that. RD testified that the principal would never follow up about those kinds of things. She testified she was asked whether or not she had opportunities to go exercising, running, jumping and playing. And she said that's what Heather said I could do. She said I could play video games. I could play board games. I could go to the PE room. I could go to kids helping kids. And I never got any information about that. That's an ER 354. And that was oral testimony, too. That was a deposition where she was under scrutiny from opposing counsel. That's not something I wrote for her or anything like that. That was just straight out of her mouth. Mrs. Davis testified also. Mrs. Frazier told me that she would make sure RD had a menu of options, but I never saw any follow-up. Ms. Zins testified that RD had a spot inside the foyer, that she either stayed there or went to the library. There was no gross motor activity. Now, the principal herself has testified. Let me ask you then, I mean, your position that the district court talked about this not being related to the Chilblains and no reasonable juror could, you know, make a finding of improper conduct by the school district. Is your bottom line is that at a minimum there's factual issues here? At a minimum, there's factual issues about whether she received gross motor activity and whether she went outside. There's also factual issues about whether she received supervision, but it's not something I think is worth that much focus. Could I ask you about the supervision? Is the supervision intertwined with the going outside? Since how does she end up under the stairway in the rain, for example? Sure. What is the relationship there? We're a little confused about that ourselves because if the court looks at the testimony of Heather Frazier, it was kind of circuitous and a little bit evasive about what the supervision was for. Was it for the 504 plan? Was it for the support plan that she sometimes calls a safety plan? Was it to prevent her from being bullied by the other child? Was it to prevent her from going outside? But fundamentally, there was no supervision of her 504 plan to determine when she could go outside, or at least there's a genuine issue of material fact about that. And then whether or not there was consistent supervision, there's testimony in the record that Janet Zins did not show up on time. She would leave early. She would disappear to go find something or say that she had to go do something. And so that's all in the record, too. But at the end of the day, there's direct testimony from R.D. saying that she was allowed to go outside, and nobody told her when to stay in. Again, the mechanics just don't work out. Nobody has been able to – Lake Washington School District has never identified somebody who actually made the determination, and that's exactly what the mother negotiated to have, was somebody to make the determination. This was an ongoing problem for four or five years before that happened. And eventually she said, look, we have to have an adult actually making that decision. And in 2017 – and this is Heather Frazier's testimony – in 2017, the adult was either Janet Zins or was a health room secretary. Mrs. Davis testified, and it's been unrebutted, that there was no health room secretary that year. There was nobody – there was no physician called a health room secretary that year. And there's been probably five opportunities for Lake Washington School District to say that's not true, and they haven't said that's not true. With regard to FAPE, I think one of the important things to point out is that there's two components of a FAPE accommodation. Obviously, the accommodation is one of the components. In Lake Washington School District – and I think this is a twist – they try to get us to argue that gross motor activity and supervision were part of the accommodation, that those were necessary. Like, how were those medically necessary? How did those help her to – how did it help to abate her children's blades, for example? But the other aspect is the FAPE itself and what you're trying to achieve with the accommodation, the education you're trying to achieve with the accommodation. The court focused on the free appropriate public education, one of the provisions in 34 CFR 104.34, which addresses mainstreaming. Obviously, the idea is to try to provide an accommodation that will make sure that the child is able to receive an education with their peers. But if the court looks at – and I agree that there's no way to really achieve that. You can't mainstream a child in an indoor recess without putting all the other children in the indoor recess. But there's – the court looks at its own decision in Poolaw v. Bishop, and this is FAPE under the IDEA. So it's not directly discussing 504, but it states that there's another way to try to achieve FAPE. And the other way to try to achieve FAPE is to create a special education environment where you replicate what the other children are able to receive. And that's exactly what the parents were asking for. So the gross motor activity and the supervision were an attempt to try to replicate recess, recess being something that's recognized under the CFRs also as FAPE. So at the end of the day, when the opposing counsel or the opposing party is going to argue that gross motor activity doesn't actually evade chilblains, but it is precisely what the school was designing, was trying to create as a non-curricular activity, which is recognized under the CFRs. If I can, I'd like to – I have just one more question if I might. Yes, Your Honor. So under 504, you know, we focused on FAPE and reasonable accommodations. And there's a second part of that where there's a claim if there's a violation of a specific regulation. Are you making the second part of that statutory argument or not? It was unclear to me from the briefs whether you're also claiming a regulatory violation. Well, no. The reason why we are pointing to the regulations is because the case law, and this is particularly – So it's a simple answer, yes or no, are you making that claim, a regulatory claim? I don't believe so. Okay, thank you. The claim comes directly out of 504, but refers to the CFRs. Thank you. Thank you, Your Honor. Thank you. You may save your time. And we'll hear from Mr. Austin. May it please your Court, I'm Don Austin. I represent Lake Washington School District, one of the attorneys representing them in this case. To begin with, regarding the one-to-one supervision of gross motor activities, we believe that Judge Jones was correct that neither of them were necessary for RD to enjoy 504 FAPE. 504 FAPE is something that is most clearly defined at 34 CFR 104.33, and it's something that includes services and aids that would include accommodations that are designed to meet the disability needs, the needs of the handicapped person, and those would be needs that are different from the general education population, so it would be the disability needs. The whole idea is to create a level playing field, and that's similar to what happened in PGA Tour versus Casey Martin. Martin needed the golf cart to be on the PGA Tour because of a disability with his legs. For him, it was a disability. If this child gets chilblains, she's not able to take advantage of educational opportunities. If she's got, as I understand it, horrible necrotic skin eruptions and all of that, she's not going to be in school or be capable of learning, so it isn't as direct as saying she needs a sign language interpreter right then and there to understand the English assignment, but it seems to me to be inextricably intertwined with getting an education. Why isn't that a permissible way to look at it? Well, to begin with, Your Honor, the school district understood what the chilblains did for her in regard to her education based upon what medical information they received, and that medical information was at page 287 of the record with Dr. Wallace, and what she needed was to have warm clothes when she was outside, and at least in kindergarten, the temperature was 55 degrees or lower than she needed to be indoors. A year after that, it was changed to 60 degrees. The only other accommodation that was indicated in the letter from the Seattle Children's Hospital at ER 218, those two doctor treatment providers indicate that she needs not to be penalized for medical appointments when she's missing school, and in essence, at ER 218, this particular medical information indicated that there were no restrictions regarding participation in PE or in sports. Well, Mr. Austin, the question I have, I'm looking at the amended plan, and it seems to combine the recess issue, as indicated, it's changed to 60 degrees, and the recess issue is rolled up into several things. One, staying inside under certain circumstances with supervision and having activities that include gross motor skills. Yeah, so that's at ER 296. And so when I read that, and then I read the other testimony from her and from the child and the parents saying that's not happening, why isn't there at least a factual issue on that? Pardon me, the last part? Why there isn't a factual issue, because we have this plan, and we have testimony that it's not being met. The reason there's no factual issue is because gross motor skill and one-to-one supervision was unnecessary for accommodating her disability. It would be just the same as if they put chess club as something that she could do during indoor recess or going to the library, and if that, for some reason, had not been allowed, it wouldn't be something that violated CFR 34-1. Well, it seems like we're kind of talking in circles. I mean, we're not talking about having her stay inside and move chess pieces around the board. And what we're talking about is what can happen for this child who can't go have recess, which is part of the education and part of the interaction. Maybe she won't be having the same interaction, but she will have some recess, per se. So I don't quite understand your answer. Maybe I'm missing something. You can run that by me again. Sorry, Your Honor. I believe that RD had access to general education recess the way that many other children had access to general education recess, even when she was inside. And that's something that's dealt with a little bit at the bottom of page SER 133, the support plan, where it's talking about things that were offered to her. It's also something where if she's going to the library, she can do that. If she wants to be in the foyer, which was where the stairs are, she could do that. But there was nothing discriminatory against her by being inside, protecting her the way that her doctors say she needed to be protected. I hear that, but the testimony says, look, she's sometimes outside in the rain. She doesn't have the supervision. And then there's not this testimony that she's inside getting something related to her motor skills. So the story you're telling me, which may well be true, seems at odds with the other evidence. The allegations are that she was without one-to-one supervision. The only place in the record that I find where she's alleging that she's without supervision is at ER 281, where the paraeducator was eight minutes late. Elsewhere in the record, ER 344 to 45, ER 336 to 347. Those are places where the paraeducator, Janet Zins, is testifying about being with her during recesses, all of the recesses. There's no testimony that says that that's not true. What there are are allegations. What about the points in the record that your colleague referred to, Mr. Albert? Are you referring to ER 358, where she says sometimes she went outside? Well, there was 258, and there was a series of other things that he mentioned. With that particular notation, ER 358, sometimes she went outside when it was cold. At ER 338, Janet Zins, the paraeducator, says that the teacher, Ms. Armstrong, would tell her whether RD was supposed to be inside or outside on a particular day. At ER 358, the reference that Mr. Albert cited, she says she's outside sometimes when it was cold. I'm assuming that there's no evidence that she was outside by herself. Janet Zins at ER 344 through 47 is testifying she was at all of those recesses. If she was outside during one of those recesses, it would have been with permission of Ms. Armstrong, who was the teacher, and would have checked the temperature to see if it was okay to go outside. With regard to the accommodations and the necessity, I think that is a key issue in this case. If somebody has a disability, and in school cases, very often this is something that happens, and the parent expresses a desire for something in addition to what would accommodate the disability, it's very common for schools to allow the extra accommodation that may not be disability-related to go down into a plan of some sort. The fact that this particular item, the one-to-one, was not disability-related, if you look at the support plan on page 133 of the supplemental SERs, on September 4th, 2016, the principal is talking with Catherine Davis in an email, and if you read that entire email, what's clear is the reason for the paraeducator one-to-one is in order to prevent bullying by a girl, DH. If you look at the emails between Mrs. Frazier and also the parent, you'll see that over the summer of 2016, from July, August, to the beginning of September, the main concern was keeping these two kids separate, and in order to solve that concern of keeping the two kids separate, the one-to-one was necessary. The plan before that was that there was no one-to-one, and Mrs. Davis in her deposition, SER 192 to 195, said that she had no problems with the 504 plans and their implementation in first, second, or third grade. That's SER 192. I'd like to ask you specifically again about the gross motor activities. I'm not sure that I've understood your argument with respect to that. In the child's deposition, she says that when she was indoors, there was no way for her to run around or jump or do vigorous activity, that she felt she was being put in a timeout, and she didn't get information that was sufficient for her to understand her options to exercise. And I understand that there's contrary testimony as well, but I don't understand why that isn't an issue of fact with respect to whether she was denied that portion of her education. She wasn't denied any portion of her education. Well, part of her education, it seems to me there's a factual issue as to whether exercise is part of the educational experience for elementary school children. And if you accept that premise, why isn't that an issue of fact about her education? The answer to that premise is twofold. Number one, PE would deal with that. And second of all, I don't think that premise is true with recess. Kids stay in and inside during recess, especially in Washington State when it's cold and rainy. They go to the library, they play chess, they stay in the teacher's classroom. A lot of kids go on the playground too. And RD was not denied access to recess. In fact, she testified in her deposition that she would often have another child with her playing games. But, you know, it sounds like a jury argument to me rather than a summary judgment sort of argument. Well, I think it goes back to deliberate indifference ultimately. And that is, was the school district deliberately indifferent with regard to this? And if you look at all of the things that the school district did, ER 381 to 384, ER 296, ER 294, 301 to 305, those are the 504 plans that the school district did with the parents and the child and also implemented. If you look at ER 344 to 45. I guess that's some of that, whether they were implemented or not, isn't that what's in dispute? I read the plans and I hear your argument and I hear Mr. Albert's or RD's argument. And that seems to be kind of where we are. We're in an argument, so to speak, over the facts and what they represent. So we have, and at one point I thought you indicated to me the plans were not necessarily illustrative or indicative or required. And now you're referencing us back to the plans as evidence that would negate deliberate indifference. Is that not some inconsistency in that posture? Well, one of the things that the district did that negates deliberate indifference is all of the time they spent putting these plans together and implementing them. Implementation first through third grade is something that wasn't a problem. The only things that the parents were concerned about during fourth grade are the one to one supervision, which accomplished its purpose, by the way, because there were no further incidents of bullying and which there's no evidence in the record to say that one to one didn't happen, except for one time when the paraeducator was eight minutes late. As far as gross motor activities are concerned, with the 504 plan requiring gross motor, normally there's going to be some type of doctor or physical therapist that says gross motor is necessary. There's no evidence anywhere in the record that gross motor was necessary. Nowhere in the record, either an argument or in the anywhere in the record. Is it something that is disability related as far as the assumption that gross motor is something that happens in all recesses? There's no evidence of that. It's something that happens in many recesses and many recesses. She was outside with the permission of the teacher who was keeping track of the temperature. Many recesses she was inside and she was inside with other kids and many other children would have been inside during those same times. Your Honor, I believe that solo text is something that should be applied the way Judge Jones applied it, because we believe that the non-moving party has failed to produce essential elements to their claims. Thank you, counsel. Thank you. Mr. Albert, you have a little bit of rebuttal time remaining. There you go. Thank you, Your Honor. I think I think Mr. Austin did describe exactly what the school district's position is, but didn't put it up front in the school district's position is that we can we can put terms into a 504 plan. We can in a 504 meeting, negotiating the 504, but they're not actually binding. We just put those in there to appease the parents. The ones that are binding are the ones that we we think are binding. I'm not sure exactly what the dividing line is, but that was put into their briefs and that was in the oral argument right now. I also understood his position to be that the fact that these were negotiated and put into place demonstrates the opposite or deliberate indifference. Well, the deliberate indifference, I would ask the court to look at Mark H. V. Hamato, this court's decision in that case. It's not this incredibly high bar. As long as they know that a federally protected right is could possibly be extinguished and then fail to act on that knowledge. That's all that's necessary for deliberate indifference. I think one of the distinctions that's being that's not being made but should be made is that Lake Washington School District keeps citing due process cases where it's not the school district itself that violated the right or that failed to provide that right. It's some third party that came in. Why didn't the school district supervise well enough? Why didn't the school district take enough action? Whereas in this case, the school district itself is the author of the right. They agreed to provide these educational opportunities to gross motor, keeping her inside, and they just failed to do it. And that is sufficient to find deliberate indifference in so far. I'm sorry. It's sufficient enough to find a genuine issue of material fact. This court decided in OVF by and through Wabi Pierce that the question of whether an actor was deliberately indifference should ordinarily go to the jury. And the issue, the genuine issue of material fact here is whether they follow through. They knew that these were were things that the parents wanted. They agreed to provide them. This is unlike a traditional ADA case where a plaintiff asks for an accommodation and the defendant just refuses to provide. They agreed to provide. They designed this with Pauly. I'm sorry, not Pauly. It was Poolaw. In the case of Poolaw, what the Ninth Circuit said, a special education environment where they designed it all. They said that gross motor activity is going to be a part of it. We're trying to replicate research. Gross motor activity is going to be a part of it. Keeping her inside, obviously, is a part of it. And supervision is a part of it. And they just neglected to provide those things. I don't see how they can now demand. The parents don't know that they think that they're not obligated to provide these things. They're not telling the parents, oh, yeah, some of these things are not actually 504 obligations that we put into the 504 plan during our 504 meeting. The parents have to apparently go through an entire litigation and then submit a brief to the Ninth Circuit before they find out the Lake Washington School District's actual position on that. And that's just absurd. It invites more litigation and it becomes very problematic. So going back to the question again, just in case I haven't addressed enough, I think Mark H. The motto is very instructive on exactly how to find deliberate indifference. And it is a question for the jury. Most of the time. And in this situation, there are genuine issues of material fact. Thank you, counsel. The case just argued is submitted. And we appreciate the helpful comments from both of you. And we'll move then to the next case. Thank you, gentlemen.
judges: McKeown, Graber, Paez